v. Slover for the opponents, Peter Wise and Stephen Beckett. Are you both going to argue? No, Your Honor, I have no argument. Okay. And for the appellee, Denise Ambrose. Okay, Mr. Wise, you may proceed, sir. Thank you. Good morning and may it please the Court. Counsel. Here the trial court heard when ruling that fingerprint testing on what has been called the unknown bridge print by running it through APHIS had zero scientific potential to produce evidence that is materially relevant to the Slover's claim of actual innocence. The plain language of this statute, the plain language that speaks the legislative intent only requires that fingerprint testing have the potential to produce evidence that is materially relevant. We don't have to make that showing a potential by a preponderance of the evidence, by beyond a reasonable doubt the statute requires we have to make some prima facie showing, which we clearly did. And potential is a very, very broad word. I wish I had a nickel for every time I heard my piano teacher say you have real potential if you just practice. Potential is the broadest of words in this circumstance. And courts have described that standard as low where in arguing against these motions on appeal, prosecutors have said, hey, we need to find, you need to find evidence, the standard has to be evidence that vindicates the defendant that's making a claim of actual innocence. No, the Hockenberry case said no. This is a low standard and the standard is consistent with the legislative intent of all we need to show is potential to show actual innocence, to support that claim. And that's because 116-3 is a remedial statute. It's a statute that was intended by the legislature to remedy wrongful convictions. This statute was created in the backdrop of the state of these, a lot of wrongful convictions. So the legislature here, the intent is clear. We want unknown fingerprints to be tested. We want unknown fingerprints to be run, we want to know the truth of this unknown fingerprint. And given this low bar established by the legislature, established by the statute, you'd have to believe that a claim for testing has to be patently frivolous before a trial court can say, no, we're not going to give a defendant that chance. This claim is far from that. The trial court made this finding that according to the state's expert, this Mary McCarthy, that the fingerprint wasn't suitable for APHIS testing. That isn't what the evidence really was. By the way, you mentioned that this is the finding the court made. What's our standard of review? Well, that's an interesting question. I anticipated that one. All of these cases that have been reported are situations where the trial court reviewed the record, the whole record as that phrase is known. This case is different in that there was an evidentiary hearing. We presented two witnesses, one state police expert in the fingerprint division, Eric Mayfield. I'm sorry. It's not his name. That's right. And then Ken Moses, and the state presented this McCarthy. So the standard, I propose that in the reply brief, when the state raised that issue, that this be a bifurcated standard review. The factual determinations are subject to a manifest way of the evidence standard. The legal conclusion to the application of law is a de novo standard. I propose that because this is a remedial statute, and de novo review of the application of law protects the remedial nature of this statute. Would we be the first court to so hold? As far as I know, yes. All of the other appellate court decisions have been decisions where the record was reviewed for the 116-3 petition. And those cases, the appellate courts reviewing those cases all announced a de novo standard. Well, you're an experienced defense counsel, and what you're suggesting certainly is one approach we would take. Another is the standard of review that would be applicable in a third stage hearing on a post-conviction petition where the trial court made findings. I, of course, that's the standard that was proposed by the state. I don't see that that standard's appropriate because in that third stage of post-conviction, it's just that. You already have two layers of judicial review. You have the initial review of the complaint by a judge, and then you have the answer or motion to dismiss by the prosecutor. All that happens is that the judge is saying, let's have a hearing. The judge has a hearing at the third stage and makes findings, and those are not bifurcated. The judge could kick out the complaint. The judge could rule that the complaint is patently without merit and is gone. That judge, he or she, is making some findings. It's a layer of review. These are legal issues, the first two stages. The third stage, if you get to the third stage, the judge says, there may be some merit here. Let's have a hearing. The judge now has a hearing and makes findings based on the evidence and decides whether or not there's been a substantial violation of constitutional rights, as I think the Post-Conviction Hearing Act speaks. That's viewed not bifurcated fashion. That also involves constitutional claims. It does. Also, this is clearly different from the post-conviction statute in its remedial nature and its much lower standard of proof. Do you want to protect the remedial nature of the standard by a de novo review of the application of the law? Moving on to this issue of what the judge ruled, all three of these witnesses said the same thing. If you look at their testimony in its totality, and I think that the best way to start it is to talk about Eric Maland, who indicated he was an ISP examiner and supervisor. He testified that the process of moving the ISP rules from a set of strict, rigid standards to the examiner has discretion to run a print and testified that process was, one, examiners who were running prints that maybe didn't meet these standards were getting in trouble with their supervisors. But more importantly, the APHIS system in 2001 was upgraded to advance more algorithms and more search capabilities. And this discretionary language was designed to have more prints submitted to APHIS. There's a whole purpose of this change. And he also indicated that a latent print examiner's discretion included estimating the core and axis of a print when the core and axis wasn't readily available. Ken Moses built on that and indicated that, you know, that that's true. And he readily acknowledged that this print, the bridge print, had no visible core. But that's true of many, many prints that are run because in the real world, most prints that police officers deal with are partial prints. You know, you don't get a nice, perfect print. You deal with partial prints and you're always estimating the core. And he explained how he would do that. Ms. McCarthy first created a standard, you know, an artificially high standard of if it won't produce an identification, you don't run a print. That may be in her mind what the standard is, but that's not what the statute says. That's not the legislative intent by a long shot. But she eventually acknowledged, and she was asked a question by the prosecutor, by Mr. Scott, would submitting this print violate the Illinois APHIS guidelines? And he's expecting, yes, it would, but he got, I can't tell you that because it's up to the examiner's discretion. There's some guidelines that we follow, but in the end, this is a discretionary standard for submitting this print. If she had exercised her discretion, if she was the one calling the shots, she would not have submitted the print, correct? That's right. You get the next examiner who exercised the discretion in favor of running the print, but then you have to look at, and then you might have an answer here. So no matter how many people say they would not run the print, maybe somebody out there would. So all prints should be submitted. Is that your argument? I think, no. I think that when you make the prima facie showing, when you meet the statutory standard, making a prima facie case that running this print has the scientific potential, which it does, the potential generated by where this print is, you know, inches from a bloodstain of Karen Slover's blood over the bridge, whereas this smudge that the state believes is material from a car or the sack that was thrown over, and there's, over the bridge, and there's body parts just downstream in the sack. Also, and you have to look at exactly who Ms. McCarthy was in the backstory there. She was thrown into the breach in the last minute, if you recall her testimony, that she was called to do a quality review standard of a guy named Mark Mills' work, which had been done 13 years ago. She didn't review his work. She didn't review his bench notes. She came up with a bare bones report. What the state needed, I think, is pretty clear as a witness. So it comes as no surprise which way her discretion swung in this case. They always say experts can be found that will say just about anything. You found an expert who went your way. She is a recognized state forensic fingerprint expert. No doubt about it. And Mr. Moses, as the judge said, is highly, highly qualified. And I don't want to call Eric Malin the dark horse, because the judge never mentions him in his analysis, but Malin's the guy that created, was on the committee that created these rules. The fingerprint in question was the subject of some extensive discussion at trial, was it not? It was. And that generates the other error. Kind of like who's, there's the real guy who committed this crime and we don't know who he is. That was argued extensively to the jury, wasn't it? It was, the appellate court opinion would suggest that it was argued to the rule 23 order, I should say. That was argued and the judge mentioned and his order was argued. But the judge ruled that that produced, that would make any testing cumulative. My first question though is, at the time, was this fingerprint tested against everyone who was involved in the case that people knew of? It was tested against the Slovers and it did not match any of the Slovers. It was tested against other people who were friends. Other investigators or people who showed up or might have had any potential claim that maybe they could have left their fingerprint there? Well, yes, and the reason was the state police understood the significant value of this print so close to the stain of Karen Slovers' blood. What's kind of ironic now is the state is saying this print is meaningless. They believed. Well, so what I'm trying to do is I want to make sure I understand your theory. Your theory is that if the print were put into this database and were examined and it comes out with Ferd Berfel, he's the guy who's print this is, that this would strongly support the defendant's claim of actual innocence? How? As we look at the statute, you would always talk about in the shorthand, the statute does not have to, the testing does not have to completely vindicate or completely exonerate. It may lead, it has the potential. Non-cumulative evidence materially relevant to their assertion of actual innocence. So let's assume it's Ferd Berfel's fingerprint. Where do we go from there? Well, Ferd Berfel, we may have swung and missed. I'll acknowledge that. But there's also, this motion isn't happening in a vacuum. There's also a PC claim that's being worked on in the early stages in the Circuit Court of Macon County where alternative suspects are being developed based on hair that was found in a body part bag and fiber that was found in a body part bag. But this isn't happening in a vacuum. That's what I'm asking. It's not clear to me, given, you know, I've seen a lot of trials, frequently a good argument is we don't know whose this is other than it's not the defendant's and that's the mystery guy and there he is and that's who really committed this crime, etc. An argument that was made, in fact. That argument was made and the judge says that that results in a, that any testing would be cumulative. If, you know, the argument that someone else did it is far more powerful if you can show that someone else did it rather than it's the mystery person, the empty chair, the whatever you want to call it. The Slovers, their attorneys at trial, wanted, that was what they went with. It isn't us because the print, that print isn't ours. You can do much more with an argument we have that's not for Burville but it's Joe Smith. He was, and Joe Smith has the blonde hair that's in the body part bag and he was wearing a blue shirt, blue wool shirt and the blue wool fibers in the body part bag. That's where this, if you want to know, that's where this case, this isn't happening in a vacuum. So that, and all we need is to establish the potential. You don't have any of that. You aren't saying that this fingerprint belongs to Joe Smith. No. The guy with the blonde hair. This is all just a mystery. It could belong to some tourist in Florida who was there the week before. Well, that's the same argument the state made in the recent Pershley case with ballistics testing. But, you know, we had a gun at trial. That case, I think, is a far weaker case for 116-3 testing than this case because they had a gun that was identified at trial and the jury saw and an examiner said that that's the defendant's gun for the best we can tell. Isn't this, wouldn't your position be a little different if, when you talk about it's not happening in a vacuum, for our purposes it is. We don't know anything other than what's before us in this record. If you had any evidence or any claim or presented any argument to the court of, you know, this guy Smith, we now have evidence, and here it is, showing that he was somehow perhaps involved in this and we want to check this fingerprint to see if it's his, as opposed to the tourist from Florida who was fishing in Lake Shelbyville a week earlier. The answer is the standard is all we need to do is make that prima facie showing, which we have done, by establishing that the potential is there given the relationship of this print to her blood and the power of the APHIS system to make identifications and that's the standard we need to meet and we have clearly done that. This is a situation where the states, everyone testified essentially the same to what APHIS does and how a print is APHIS suitable. The state's experts discretion swung one way, but she clearly acknowledged that. There were some specific facts. Your guy said I think there were six points of identification and McCarthy said, no, your guy said 13 points. McCarthy said only six. She said six, but six to eight, and that is correct. Again, that's fingerprint analysis. Six to eight is enough because of the discretion built into the statute. See, I'm about up. We'll allow the state to address the court. We'll hear from you again, Admiral. Thank you.  May it please the court and counsel, defendants did not make the appropriate showing because there was an evidentiary hearing and like most hearings like that, the court decided which expert he believed the most and it turned out to be the state's expert. It's not clear to me what's really kind of at stake here. That is, there seems to be a big threshold present before this test is run. Why is it? Is it because of the cost, the difficulty, the delicacy of the evidence itself? What's going on? Why don't you say, hey, sure, let's just check. Okay. You have Eric Maland testified as a state witness and it's pathetic. He's a forensic examiner, but he was doing fiscal accounting because there had been cutbacks in the office and they were short staffed. Granted, this statute is meant to provide inappropriate cases when the latent is suitable to perhaps generate and facilitate a claim of actual innocence. But when you have a poor quality latent and there was nothing else to make up for it, McCarthy said she couldn't find, you know, she couldn't designate a pattern. She couldn't find the core. She couldn't find a delta or any other crease to orient the axis. She couldn't find sufficient points that would be from the main part of the finger. She said she'd be guessing. And if they start doing that, first of all, they clog the computer and they're using a lot of time. Was there testimony as to how long this would take? They said it would take an hour just to do the tracing. Now, each time you run the print with a different algorithm, you're going to get 10 different candidates. And then you have to do a side-by-side visual examination and comparison on the screen. And if you see something that seems to match, then you get the original. This is a latent print, right? Yes. Is there a photograph of it? Well, there's a photograph that the defense expert examined. And we don't know who provided that photograph to him. Of course, there was no objection from the state as to, you know, that part of the evidence. But the thing about APHIS is you keep generating. You can run it the same way twice and come up with 10 different candidates. Because when it comes to a latent print, the human examiner exceeds the computer. This is not where you can sit back and relax and have the computer do your work for you. You have the human. Wait a second. I saw CSI just a couple weeks ago. And they, you know, within 10 seconds, and there it was, this computer screen. That's not how it works? No, that's only with the known prints. But all three experts said when it comes to latents, you have somebody there. The human still exceeds the computer. Now, maybe several years from now, that won't be the case. But you still have to have the state expert, one of the fingerprint experts, taking a visual look at the 10 candidates. Now, how many times are you going to run it? According to Moses, he was suggesting that, oh, let me see. We can designate different cores and different axes and run it several times through several algorithms. You'd have an examiner looking at perhaps 50, 60 candidate lists from a poor-quality latent. And even Ms. McCarthy said, yeah, I have discretion. But there usually has to be something to make up for, you know, if you don't have sufficient points, then there's something else in the print that you can make a reliable indication of, you know, this is the pattern or this is the core. And she said there was nothing there for her to designate a phantom core. She said that, in her opinion, Moses' suggestion that you designate the phantom core and give it a shot was guessing. The database against which this print would be checked is essentially government-controlled? Yes. I mean, this is not something where the defense can say, I got this picture, I want to use some private lab or something. No. And according, yeah, it's just only the state agents can use their discretion, unless, of course, you know, you get a court order and the court wasn't persuaded here, because he thought the reasons McCarthy gave for, you know, in my discretion, I would not run this. And her colleague agreed that, you know, it was- Moses' argument that all was needed is, as he put it, the potential, the same potential for him to be the concert pianist. That's not the wording of the statute. It has to have the scientific potential to produce non-cumulative evidence materially relevant. You know, and the court said, if you've got a poor-quality latent, you're going to generate garbage. It's going to be- you're wasting time. And also, the bigger the database, you know, you might find something that looks similar, but that's the Mayfield effect. And, of course, Moses is very familiar with that, having, you know, his known error rate was the only evidence in the record, you know, and it was a pretty well-publicized case, too, and that was the problem. It- he came up- Mayfield's name came up on this search, and the larger the database, and it keeps growing, you know, and growing, you might hit somebody in Alaska, you know, that looks similar, but it's not the source of the print. Why isn't Mr. Weiss correct when he says having a real person, if a print could be identified as a real person, would be more significant for their- to their claim of actual innocence than just there's this print that could be real significant as argued to the jury? As opposed to an unknown. Right. Well, of course, you have to- when you come to fingerprint evidence, you have to show the time that it was impressed. You've got a problem here because it's in a public place, and then you had evidence in the record from the three- Joe Smith's fingerprints. Let's assume that that was the result. Isn't that potentially an important determination for the defense? No, not unless you show that Joe Smith impressed that fingerprint in that 32-hour period when, you know, when Karen was abducted until the first body part was found on Sunday. Well, if there were other evidence linking or pointing in some fashion to Joe Smith, the fact that his print was on this guardrail would be pretty significant, wouldn't it? It would become more probative, but again, the time when it, you know, any number of cases the state has had, you know, the defendant will say, well, yeah, I happened to visit there and I was leaning on the guardrail, and especially when you have something in a public place, it's difficult to show that it was connected or impressed at the time of the crime or during a relevant period of time. They made a lot of headway with this unknown print, even though, you know, it was up in the air as to when it was put there because they had the crime scene technician who said two hours before Sieferman lifted the print from the guardrail, you've got media who are hanging over this very area and filming them as they're collecting body parts. They weren't wearing gloves and it was sunshiny, and so, I mean, he might have very well lifted something from a person in the media. And they said, well, if Karen knew anybody that, if it comes back to somebody that Karen happened to know, well, she was working for the Herald and Review. That wouldn't be particularly, you know, astounding. The defendant's also saying that the trial court imposed too high of a standard, but it was right on the mark. There was nothing in its written opinion that indicated that it thought, you know, the defendant had to show that this print would completely vindicate them. To what extent does the strength of the circumstantial evidence leading to the conviction of the defendants matter in resolving the issue before the court? The court seemed to make some reference to that, didn't it? Yes. Now, that part is deniable review because it was examining the record, whereas deciding which expert to believe, of course, I think is a standard of review for medicine. I'm perhaps not being clear. In deciding whether or not a defendant has met the burden of showing what is necessary under 116-3, is it an appropriate consideration for the trial court to evaluate the strength of the underlying case in which the convictions result? Yes, it is. Has anyone so said that? Any case explicitly stated, well, you know, maybe this has the potential, but look at just how strong the evidence was here against the defendants. Sure, it was the Savory case. It was the Illinois Supreme Court. What did they say in Savory on that point? Oh, let me. Well, that's where the court decided that the defendants did not prove enough, let me see. Okay. Okay, yes, they decided that the defendant's assertion of actual innocence was not, the evidence he sought to test was not materially relevant to his claim of actual innocence based on assessment of the evidence. He sought to test in his review of the transcript of the trial. So, yes, you consider what evidence there was of guilt in also deciding whether it would be materially relevant. If the trial court had granted the motion for forensic testing here and the fingerprint had been sent to the lab, could the lab technician have said, hey, judge, this print isn't good enough for me to test? Well, you mean whether the court order can supersede, I would assume the court order could supersede the discretion that the Illinois State Police have. So if the lab technician says it's not good enough to test, the court can say go ahead and test it anyway? Well, if the court finds that the statute has been satisfied, then I think the court order can prevail over their discretion. Although, I mean, Illinois is broke, and of course that is secondary, but this is meant for good quality prints, so it can generate something that's useful. It's not meant as a fishing expedition where you stick something in and hope, you know, you can come up with a candidate list and maybe run with it. She said you're just not going to get a good, you're not going to get an ID from this. What you're going to get is a bunch of candidate lists. So essentially what we have here is the lab saying it's not good enough to test. Yes, and the court said, I believe you. I think that's true. I think you've given me enough facts to show that that is true. What about the standard of review on that finding? On the finding of which expert to believe? And the judge's conclusion. Well, the manifest error as to which expert, and then when he assesses if it were good enough, he still found that in the context of the standards, that it still would not provide, you know, it would still not meet the statutory standard. And Justice Cook wrote Rule 23 in the direct appeal and set forth all of the evidence, albeit circumstantial, that pointed to their guilt. And that same evidence impressed the trial court to believe that this fingerprint evidence, in the context of that other evidence, simply would not be enough. It wouldn't be enough to produce new non-cumulative evidence materially relevant to the assertion of their actual innocence? Yes. I mean, the court followed the standard. There's just no record indication that it did not. To what extent, it's not in the record, but we've heard the suggestion from Mr. Weiss, to what extent should we be concerned or consider that this isn't occurring in a vacuum, that other stuff is going on? Well, I think that's, we have to wait for the PC to arrive before you, this deals with the fingerprint, periodically. So your position is that that shouldn't concern us at all? No. That's not the standard. I think you look at the evidence to be tested, not something else out there. And I do have to say this, that the state was willing, you know, there were a bunch of blatants on the Hardee's stack, that they had submitted that through APHIS and didn't get a hit, and then the state agreed to run it through the FBI system. It's not like the state is stonewalling here. And even the woman, Luke, who had McCarthy review this, she said she wasn't going to make the defense go through the motions of filing a claim for fingerprint testing. She said if it's APHIS suitable, run it. So the state is... So it was done on the Hardee's bag, you say? There were a bunch of latents on the Hardee's bag that were never identified, and that was part of the motion. They wanted that submitted through the FBI system, and the state agreed to that because the latents met the mark there. Are there any other questions? Thank you. Thank you, counsel. Mr. Wise? First I'd like to address Justice Cook's notion that the lab is saying that this is not suitable. There is no laboratory personnel that examined this print in a laboratory setting and made this finding. There is a state litigation expert, the state that came in and said that this was not suitable. But you look at Mark Mill's, his notes say nothing about APHIS suitability. What about McCarthy? Pardon? What about McCarthy? She did not examine this in the context of I'm a laboratory analyst getting ready to run this print. She looked at this in the context of quality control of Mark Mill's work, and that's, I think, completely different. What we can't have is... If the state had assigned her to do it, could she not? Was she qualified to do the testing? I think the answer to that is yes. I don't know if she was actively doing fingerprint testing. She was the latent print training coordinator. Training coordinator. Whether she's actually doing print testing in the lab right now, I don't know that she testified to that. But be that as it may, we can't have the state police dictating the standard. The legislator dictates the standard for this testing. And this testing, to move on to the next point, is only a step in the process. This isn't a post-conviction case. I don't want to get hung up on this. The Pursley case, which I've referred to a couple times, decided in January this year, I think is one of the most instructive cases on this particular statute. And in that case, the court pointed out that the defendant, addressing just that argument, what is this? The defendant was merely moving for forensic testing and still would have to overcome more significant hurdles should the defendant get to a post-conviction proceeding. This is just a step. That's how the legislature designed this statute. Does this have the potential to produce scientific evidence that's materially relevant to a claim of actual innocence that would be raised at a post-conviction proceeding? This step gets you there. I think that's the way to look at this. The next thing I would like to address is just the statement of circumstantial evidence question. And yes, we have a Rule 23 order here authored by Justice Cook that says there was sufficient evidence to support a conviction. Having said that, we're not here to argue that issue over again. But firstly, as an example of a case where the trial court says there's, or the appellate court who ruled on the 116-3 petition said, yes, there's circumstantial evidence that supported conviction here. But that doesn't stop us from granting, from reversing the trial court that denied the 116-3 petition. And Price and Johnson are other examples of that. In terms of the Savory case, which was discussed, two issues. One, Savory made statements, inculpatory statements, far different from this case, far different. And second, the court ruled in Savory that the testing he wanted was insignificant compared to what his defense was in that case. So Savory doesn't help in this circumstance. We're getting some discussion here from the state that this is just some clunker of a latent print. It was good enough to exclude the slovers. It was good enough to exclude the crime scene technicians that were there. It was good enough to do a lot of work with. Is there a difference between excluding a known print and a known person and comparing it to a million or millions of people across the country? Well, there is a difference in that when you're using, when you're putting a print through APHIS, you put it in and you have to put the, you know, you make a tracing. And by the way, that takes about an hour. And running the print takes about 15, 20 minutes at minimal cost, according to Moses. And so the technical difference between running a latent and testing a latent against a known print, I'm not, I'm not an expert on. But the people described, the witnesses described the process of tracing, which I don't think you have to do to run a latent print. Okay, thank you, counsel. Time is up. We'll take some other advice.